UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ALAN BREEDLOVE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 16-cv-1125-JES |
| | ) |
| TERI KENNEDY, Warden, | ) |
| | ) |
| Respondent. | ) |

# ORDER AND OPINION

Now before the Court is Petitioner Alan Breedlove's Petition (Doc. 1) for Writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth below, Breedlove's Petition (Doc. 1) is DENIED and the Court declines to issue a Certificate of Appealability.

## BACKGROUND[1]

*(1) Alan Breedlove's Trial and Direct Appeal*

On the morning of April 26, 2000, Alan Breedlove traveled to the residence of his former wife, Valerie Rakestraw. While Breedlove and Rakestraw were inside the apartment, a fire broke out. First responders pulled Breedlove from the burning apartment through the south door. He was later treated for burns to his face, arms, and torso, and cuts to his inner forearms and neck. Valerie Rakestraw's severely burned corpse was recovered near the north door. A hunting knife was found next to her body, and she had been stabbed multiple times in the chest and back. *People v. Breedlove*, 2015 IL App (3d) 140571-U, 2015 WL 5139649 at *1.

---

[1] The following facts and procedural posture relevant to Breedlove's § 2254 petition are drawn from the state court record. This Court will presume that the state court's factual determinations are correct for the purposes of habeas review unless Petitioner points to clear and convincing evidence to the contrary. See 28 U.S.C. § 2254(e)(1); *Kidd v. Lemke,* 734 F.3d 696, 703 (7th Cir. 2013).

1

Breedlove was charged on June 2, 2000 with Rakestraw's murder in a five-count indictment in the Tenth Judicial Circuit Court in Tazewell County, Illinois. Three days later the court appointed a public defender, Dean Hamra, to represent Breedlove. Breedlove later sent a letter to the public defender's office complaining about Hamra and requesting another attorney. In response, the public defender's office assigned John Lonergan to assist Hamra in February of 2001. Breedlove's trial began on May 22, 2001. *Id*.

At trial, the State presented evidence showing that Valerie had been married to her new husband, John Rakestraw, for 34 days before her death. Valerie had two sons, Jeff and Brent Breedlove. Alan had adopted Jeff and Brent in their youth. Even after two divorces and Valerie's new marriage to John, Alan and Valerie continued to talk and visit each other. Valerie and John lived next to her son Jeff, who worked for John for five years. John and Jeff drove to work together at 6:30 a.m. on April 26, 2000. Valerie usually left for work at 7 a.m., and was thus home by herself at 6:40 a.m. when John and Jeff passed Alan Breedlove driving in the opposite direction. John and Jeff learned of Valerie's death shortly after 7 a.m. *Id*. at *1–2.

Christopher Sprague also testified at trial. Sprague testified that he approached the south door of Rakestraw's apartment shortly before 7 a.m. to serve papers on her relating to medical bills. He also had papers to serve on Breedlove. As he approached the apartment, he heard a man and a woman yelling. After Sprague knocked on the door, Breedlove opened the door about 12 inches and stood with the left side of his body outside. While Sprague was explaining that he was serving papers on Valerie, he heard a woman's voice yelling for help. Breedlove grabbed the papers and slammed the door shut. Sprague went to his vehicle and called 911 before noticing smoke coming from the northeast window of the apartment moments later. *Id*. at *2.

John Rakestraw testified that days before her death, Breedlove told him that he visited Valerie every morning. Brent Breedlove testified that the knife found at the scene looked like one that he saw on a shelf in Alan Breedlove's basement sometime in April of 1999. Neither John or Valerie owned a hunting knife. *Id*.

An autopsy was conducted on Rakestraw's body by forensic pathologist Dr. Travis Hindeman, who testified that she died from multiple stab wounds, consistent with the blade of the hunting knife, that were inflicted before the fire. Hindeman also reviewed photographs of Breedlove's cuts and testified as to his opinion that the cuts on Breedlove's forearms and neck were self-inflicted. *Id*.

Breedlove did not testify at trial. The defense called Gary Rafool, a bankruptcy attorney, who testified that Breedlove and Rakestraw appeared to get along fine when he met with them the day before her death. *Id*. On May 24, 2001, the jury returned a verdict finding Breedlove guilty of first degree murder, and Breedlove was later sentenced to 50 years of imprisonment. On direct appeal, Breedlove argued that he was not admonished by the trial court of his obligation to preserve sentencing issues with a written motion—a requirement under the version of Illinois Supreme Court Rule 605(a) that took effect months after Breedlove's trial. See *People v. Breedlove*, 342 Ill. App. 3d 924, 925, 795 N.E.2d 862, 863 (2003), *as modified* (Aug. 21, 2003), *aff'd*, 213 Ill. 2d 509, 821 N.E.2d 1176 (2004).

*(2) Breedlove's Postconviction Petition*

In 2004, Breedlove filed a pro se postconviction petition alleging that his trial counsel was ineffective in numerous ways. Breedlove was appointed counsel, who certified that he had suggested amendments to the petition but Breedlove had rejected them. The petition was dismissed and Breedlove appealed. The Illinois appellate court remanded the case and instructed

3

counsel to review the pro se petition and file necessary amendments. *People v. Breedlove,* No. 3–08–0082 (2010) (unpublished order under Illinois Supreme Court Rule 23). Following the remand, Breedlove's postconviction counsel filed an amended petition that included allegations that Hamra was ineffective. Specifically, Breedlove alleged in his petition that during the time Hamra represented him, Hamra was engaged in various unethical and illegal activities culminating in his conviction and disbarment. Breedlove attached several exhibits in support of the petition, including: "(1) Hamra's investigation of several individuals whom the defendant thought were possibly involved in the murder; (2) a police report of an interview with the defendant's treating physician, Dr. Milner, who told the police that the lacerations on the defendant's arms and neck were self-inflicted; (3) a report from the Illinois fire marshal which stated that a fire occurred in the defendant's basement in September 1999 and caused 'much burning to shelves'; and (4) a letter from Lonergan in which Lonergan said that he would have said or done something if Hamra prevented the defendant from testifying." *Breedlove*, 2015 IL App (3d) 140571-U, 2015 WL 5139649 at *3.

The trial court granted the State's motion to dismiss the amended petition. Breedlove appealed, and the Illinois appellate court remanded the case for an evidentiary hearing after finding that Breedlove made a substantial showing that he had received ineffective assistance of counsel at trial. *People v. Breedlove*, 2013 IL App (3d) 110765-U, 2013 WL 3788611 at *1. The trial court then held an evidentiary hearing on Breedlove's ineffective assistance of counsel claim. *Breedlove*, 2015 IL App (3d) 140571-U, 2015 WL 5139649 at *3.

Petitioner's father, Wayne Breedlove, testified at the hearing that on August 24, 2000 and January 31, 2001, Hamra called him demanding $25,000 to pay for investigation and trial expenses. According to Wayne, Hamra would do little for Breedlove without the money because

4

"he could not afford to waste his time for the amount of money that the county was paying him." *Id*. at *3. On both occasions, Wayne told Hamra that he did not have the money. Bobby Henderson, who was a sergeant with the Tazewell County Sherriff's Department in 2000, testified that he interviewed Dr. Anthony Firilas about Breedlove's injuries. Firilas stated that "there was no way to tell if [Breedlove's neck injury] was self-inflicted or not." *Id*. However, Firilas did not have knowledge of the injuries on Breedlove's arms. Breedlove's postconviction counsel submitted an affidavit from Firilas into evidence which corroborated Henderson's testimony. *Id*.

Petitioner Breedlove also testified at the evidentiary hearing. He testified that he was represented by Hamra and Longergan, and his father told him about Hamra's demand for payment. Breedlove believed that Hamra would not be able to provide an adequate defense without the $25,000. Breedlove then wrote a letter to John Bernardi, the head public defender, complaining about Hamra. Bernardi responded to Breedlove's letter by informing him that the Tazewell County Public Defender's Office did not have the funds to replace Hamra, but he would appoint Lonergan as co-counsel. Hamra never informed Breedlove that he was being investigated for engaging in unethical or illegal activities. *Id*.

Breedlove further testified that each time he met with Hamra, he stated his intention to testify at trial. Hamra allegedly responded by informing Breedlove that "if [he] persisted and [kept] asking him, that he would get up, and leave, and [the defendant] could represent [himself]." *Id*. at *4. Breedlove again reminded Hamra on the morning of trial that he wanted to testify, and Hamra made Longergan sit between himself and Breedlove. Breedlove testified at the hearing that he wanted to testify at trial as to the following:

First, Breedlove intended to testify that he and Valerie maintained a good relationship after their divorce and he visited her almost every day for breakfast and occasional sex before work. The day before Valerie Rakestraw's murder, he and Valerie met with their bankruptcy attorney. That evening, Breedlove had some drinks at a bar before returning home to snort and smoke cocaine for the rest of the night. Breedlove used cocaine and opiates almost every day. *Id*.

Second, Breedlove intended to testify that on the day of the murder, he drove to Valerie's apartment and saw a green Ford Explorer parked nearby in an alley. He further observed that the trunk of Valerie's car and the back door to her apartment were open. When Breedlove entered the apartment and called for Valerie, she yelled at him to not come in. He saw Valerie arguing with a black male before three other black males shoved him into the kitchen. Breedlove identified one of the men as "Junebug," who socialized with Breedlove's previous employer, Eddie McCoy, and Terry Edwards. The men asked where the drugs Breedlove stole from McCoy's truck were located, to which Breedlove responded that he did not have them. A short male with a gun and knife then told Breedlove that "[y]ou'll come up with it or we'll make sure you never take any again." When Breedlove heard a knock at the door he partially opened the door and saw Sprague. He grabbed the papers that Sprague was attempting to serve on Valerie, but he did not try to leave because the man with the knife and gun was standing near him. Rather, Breedlove tried to tip off Sprague that he was in duress through eye contact before the other men forced the door shut, hit him in the head, and cut the side of his neck. He noticed the apartment was filling with smoke and recalled being pulled outside. *Id*.

Breedlove was transported to the hospital for treatment and placed in a drug-induced coma, causing him to have trouble remembering Valerie's murder until some point before the day of trial. *Id*. When Breedlove's memory returned, he told Hamra. Breedlove also stated that he did

not own the hunting knife that was admitted into evidence, though he did own some fillet knives that were destroyed in an electrical fire in September of 1999. Breedlove attached the fire marshal's report—which stated that the fire occurred in the basement and burned some shelves—as an exhibit to his postconviction petition. Breedlove also asserted that he did not inform the court about his issues with Hamra because Hamra promised to call numerous witnesses on his behalf and Breedlove believed Hamra when he told him he could testify. On cross-examination, Breedlove said that Hamra informed him on the day of trial that he would not testify and his memory was "very clear on the day of trial." *Id*. at *5.

Breedlove explained that he did not recall telling Dr. Robert Chapman in August 2000 that he had no memory of the events leading up to Valerie's murder, and that Dr. Chapman must have misunderstood him. He did remember stating at sentencing that "although I don't remember a thing that happened on that terrible day, I am very sorry she is gone." Breedlove asserted in his postconviction hearing that he made the statement because he had given up hope. Breedlove also testified about interviews that the sheriff's investigator conducted at Breedlove's request, and noted that the interviews were based on an "enemies list" Breedlove provided to Hamra. The list did not include anyone with the name of "Junebug," but did include McCoy and Edwards. *Id*.

The State also called Hamra as a witness, who testified that he did not know Breedlove's father, Wayne, and did not ask him for $25,000 to pay for an investigation. Hamra also testified that he and Breedlove discussed the idea of Breedlove taking the stand at trial, stating "[w]e discussed it, and at that time, [Breedlove] was unable to remember anything that occurred at that time—and Mr. Lonergan and I spoke with him. We all came to the conclusion that we were not going to put him on the stand." Hamra further testified that Breedlove did not object to his decision, nor did he tell Breedlove that he would not defend him if he elected to testify. Hamra

7

recalled that Breedlove sat between him and Lonergan at trial because he remembered turning to his right to speak to Breedlove. Hamra was not aware of Breedlove's claims prior to the postconviction hearing, but he did acknowledge that he was convicted of felony theft and disbarred. Hamra also testified that he sought help from the Tazewell County Sheriff's Department to investigate the individuals named on Breedlove's "enemies list," but Sergeant Henderson reported that the potential suspects all had alibis or were unable to be at Valerie's apartment at the time of the murder. Finally, Hamra testified that forensic pathologist Dr. Travis Hindeman was emphatic that Breedlove's arm wounds were indicative of suicide. *Id*. at *5–6.

Following the evidentiary hearing, the trial court entered a written order finding as follows: "(1) Wayne and Hamra likely had a conversation concerning Hamra's demand for $25,000; (2) there was no evidence that Hindeman's determination regarding the defendant's wounds was incorrect; (3) Hamra attempted to investigate a third-party murderer; (4) evidence that the defendant's hunting knife was destroyed in a fire before the murder had little probative value to refute Brent's testimony; and (5) the defendant's testimony that he asserted his right to testify was incredible and defense counsel reasonably would have advised the defendant not to testify because the defendant had no recollection of the events." *Id*. at *6.

*(3) Breedlove's Appeal from the Denial of his Postconviction Petition*

Breedlove appealed the denial of his postconviction petition, arguing that Hamra provided ineffective assistance by: (1) preventing Breedlove from testifying in his own defense; (2) failing to call Firilas to discredit the State's expert witness, Hindeman, and his opinion that the neck wound was self-inflicted; and (3) failing to investigate whether Breedlove's hunting knife was destroyed in a fire prior to the murder. *Id*. at *8–10. As to the first ground, the Illinois appellate court found that Breedlove "did not substantially show that he made a contemporary

8

assertion of his right to testify at trial." With respect to the second ground, the appellate court found that Breedlove "did not make a substantial showing that he was prejudiced by the omission of Firilas' testimony." And the appellate court rejected Breedlove's argument regarding the fire marshal's report because Breedlove's "evidence pertaining to his hunting knife did not have a reasonable probability of altering the outcome as it did not conclusively establish that the defendant's knife was destroyed during the fire." *Id*. Following the Illinois appellate court's affirmance, Breedlove filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court. The Illinois Supreme Court denied Breedlove's PLA on January 20, 2016. *People v. Breedlove*, 48 N.E. 3d 673 (Ill. 2016).

*(4) Breedlove's Federal Habeas Petition*

Breedlove timely filed the instant Petition for Writ of habeas corpus under 28 U.S.C. § 2254 on April 25, 2016. Doc. 1. Therein, he raises three ineffective assistance of counsel claims. First, Breedlove argues that his counsel was ineffective for denying him the right to testify at trial. Second, Breedlove argues that counsel was ineffective for failing to investigate physical evidence and witnesses, which the Court understands as the failure to call Firilas and the failure to introduce the fire marshal's report. Third, Breedlove asserts that counsel was ineffective because Hamra had a conflict of interest arising out of his own criminal investigation and subsequent disbarment proceedings. Doc. 1, at 5–6.

The Respondent filed an Answer to Breedlove's Petition, arguing that grounds one and two fail on the merits because the state court applied the correct legal standard and its factual determinations were reasonable. With respect to ground three, Respondent argues that Breedlove procedurally defaulted his claim by failing to raise it through one complete round of state court review. Doc. 8, at 6–14. Petitioner then filed a Reply. Doc. 12. This Order follows.

**LEGAL STANDARD**

"Under the Antiterrorism and Effective Death Penalty Act ('AEDPA'), [a] federal court may grant a federal petition for habeas corpus only if the state court's ruling on the federal constitutional question 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Snow v. Pfister*, 880 F.3d 857, 863–64 (7th Cir. 2018) (quoting 28 U.S.C. § 2254(d)). Thus, "[a] petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fair minded disagreement." *Id*. at 864 (quoting *Campbell v. Reardon*, 780 F.3d 752, 761–62 (7th Cir. 2015)).

However, "[t]his 'deferential standard of review applies only to claims that were actually adjudicated on the merits in State court proceedings.'" *Snow*, 880 F.3d at 864 (quoting *Campbell*, 780 F.3d at 762). In addition to the merits of a petitioner's claims, federal courts "must consider which claims have been procedurally defaulted." *Id*. There are two varieties of procedural default. First, procedural default occurs "where the state court declines to address a petitioner's federal claims because the petitioner did not meet state procedural requirements[.]" *Id*. (quoting *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016)). In order for procedural default to apply in this circumstance, the state court's rejection of a federal claim based on a procedural rule must be "both independent of the federal question and adequate to support the judgment." *Clemons v. Pfister*, 845 F.3d 816, 819 (7th Cir. 2017).

Second, "[a] state prisoner can procedurally default a federal claim if he fails to 'fairly present' it 'throughout at least one complete round of state-court review, whether on direct appeal

10

of his conviction or in post-conviction proceedings.' " *Clemons*, 845 F.3d at 819 (quoting *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)). Thus, "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," which in Illinois requires the petitioner to "include his claims in a petition for leave to appeal to the Illinois Supreme Court." *Snow*, 880 F.3d at 864 (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845–46 (1999)). Finally, "[p]rocedural default may be excused ... where the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.' " *Snow*, 880 F.3d at 864 (quoting *Thomas*, 822 F.3d at 386).

## DISCUSSION

In order to prevail on a claim of ineffective assistance of counsel, "a plaintiff must show that counsel 'made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment' and that the errors deprived the defendant of a fair trial." *Snow*, 880 F.3d at 864 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In order to make this showing, the plaintiff must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 865 (quoting *Strickland*, 466 U.S. at 867). When an ineffective assistance of counsel claim is raised in a federal habeas petition by a state prisoner, "the prisoner must show that the state court's decision is contrary to or involved an unreasonable application of this standard." *Id.* (quoting *Campbell*, 780 F.3d at 761–62).

*(1) Breedlove's First Claim*

The Illinois appellate court dismissed Breedlove's first ineffective assistance of counsel claim—alleging that Hamra denied Breedlove his right to testify at trial—after deferring to the

11

trial court's finding that Breedlove's testimony at the postconviction hearing was incredible. Doc. 1, at 5. Specifically,

> Hamra's testimony regarding the defendant's right to testify at trial was consistent with the trial record and a letter from Lonergan. As Hamra noted, the defendant had said on the record that he had no recollection of the events surrounding Valerie's murder. Lonergan also said in a letter to the defendant that he would have said or done something if Hamra had prevented the defendant from testifying. Therefore, the trial court's determination was the result of a conflict between the defendant's testimony that he repeatedly asserted his desire to testify and Hamra's recollection that the defendant did not recall the events or assert his right to testify. In light of this evidence, we conclude that the defendant did not substantially show that he made a contemporary assertion of his right to testify at trial, and the trial court's ruling on this issue was not manifestly erroneous.

*People v. Breedlove*, 2015 IL App (3d) 140571-U, 2015 WL 5139649 at *8. The above factual and credibility determinations by the Illinois trial court are presumed to be correct unless Breedlove rebuts those determinations with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Breedlove has failed to meet this burden. In the Seventh Circuit, a defendant who wishes to raise a claim that his counsel prevented him from testifying at trial must "meet a heightened pleading standard before the court must hold an evidentiary hearing on the question of waiver." *Thompson v. Battaglia*, 458 F.3d 614, 619 (7th Cir. 2006) (quoting *Underwood v. Clark,* 939 F.2d 473, 476 (7th Cir. 1991)). "In other words, a 'barebones assertion by a defendant, albeit made under oath, is insufficient'; something more, such as an affidavit from the lawyer who allegedly forbade his client to testify, is required." *Id*. Here, Breedlove has come forward with nothing but his own assertion that he repeatedly told Hamra of his desire to testify. As the Illinois trial and appellate courts found, Breedlove's testimony that his memory of the events surrounding Rakestraw's death was "very clear" on the day of trial is contradicted by his prior testimony at sentencing, where he stated that "although I don't remember a thing that happened on that

terrible day, I am very sorry she is gone." *Breedlove*, 2015 IL App (3d) 140571-U, 2015 WL 5139649 at *5. Breedlove's claim was also contradicted by Lonergan's letter stating that he would have intervened if Hamra attempted to prevent Breedlove from testifying. Thus, the trial court's determination that Breedlove did not assert his right to testify at trial was reasonable. Because Breedlove has not come forward with clear and convincing evidence to the contrary, his first claim of ineffective assistance must be denied. *See* 28 U.S.C. § 2254(e)(1).

*(2) Breedlove's Second Claim*

Second, Breedlove argues that counsel was ineffective for failing to investigate physical evidence and witnesses, which the Court understands as the failure to call Firilas and the failure to introduce the fire marshal's report. Doc. 1, at 5. Recall that Hindeman testified at trial that he examined photographs of Breedlove's wounds and concluded that the wounds were self-inflicted. Breedlove argues that Hamra was ineffective for failing to discredit Hindeman with testimony from Firilas. Sergeant Henderson testified that he interviewed Dr. Anthony Firilas about Breedlove's injuries, and Firilas stated that "there was no way to tell if [Breedlove's neck injury] was self-inflicted or not." *Breedlove*, 2015 IL App (3d) 140571-U, 2015 WL 5139649 at *3. However, Firilas did not have knowledge of the injuries on Breedlove's arms. Breedlove's postconviction counsel submitted an affidavit from Firilas into evidence which corroborated Henderson's testimony. *Id*.

In affirming the trial court's denial of Breedlove's postconviction petition, the Illinois appellate court stated:

> Giving deference to the trial court, we find that the defendant did not make a substantial showing that he was prejudiced by the omission of Firilas' testimony. Firilas' affidavit did not conclusively establish that the defendant's neck injury was inflicted by another as Firilas averred that it was impossible to determine whether the wound was self-inflicted. This statement was further called into question by Milner's statement to the police, which was attached as an exhibit to

13

> the defendant's amended petition. Milner told the police that the injuries to the defendant's arms were self-inflicted, and he thought that the defendant's neck wound was also self-inflicted. As a result, we agree with the trial court that the evidence did not indicate that Hindeman's determination was incorrect. In light of this evidence, we conclude that the trial court's finding that the defendant did not satisfy the prejudice prong of the *Strickland* test was not manifest error.

*People v. Breedlove*, 2015 IL App (3d) 140571-U, 2015 WL 5139649 at *9. As the Illinois trial and appellate courts found, Breedlove has not shown that he was prejudiced by Hamra's decision not to call Firilas to testify at trial because Firilas' testimony would not have contradicted the testimony from the State's expert witness—a forensic pathologist—that Breedlove's arm and neck wounds were self-inflicted. Thus, the state court reasonably determined that Breedlove's second ineffective assistance of counsel claim failed because he did not show that he was prejudiced by counsel's failure to call Firilas to testify at trial. *See Eddmonds v. Peters*, 93 F.3d 1307, 1320–21 (7th Cir. 1996) (counsel not ineffective for failing to a call an expert witness where the expert's testimony would not have contradicted the prosecution's expert).

Breedlove also asserts that his counsel was ineffective for failing to introduce the fire marshal's report. Doc. 1, at 5. Recall that Breedlove testified at the evidentiary hearing that the knife recovered from the crime scene was not the same knife that he kept in his basement. Brent Breedlove testified at trial that he saw a hunting knife similar to the one recovered at the crime scene on a shelf in Breedlove's basement sometime in April of 1999. According to Petitioner Breedlove, that knife was destroyed in an electrical fire in September of 1999. The fire marshal's report documented that there was a fire in Breedlove's basement and the shelves were burnt. In rejecting Breedlove's claim of ineffective assistance arising out of Hamra's failure to introduce the report at trial, the Illinois appellate court stated:

> The defendant's evidence pertaining to his hunting knife did not have a reasonable probability of altering the outcome as it did not conclusively establish that the defendant's knife was destroyed during the fire. This evidence also could not

14

> eliminate the possibility that the defendant acquired another knife prior to the murder. Thus, the defendant did not make a substantial showing that the evidence regarding the prior destruction of his hunting knife had a reasonable probability of altering the outcome of the proceeding. The trial court's ruling was not manifestly erroneous.

*Breedlove*, 2015 IL App (3d) 140571-U, 2015 WL 5139649 at *10. In order for Breedlove to succeed on his ineffective assistance of counsel claim, he must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, the fire marshal's report would have been "marginally exculpatory" at best. *See Brady v. Pfister*, 711 F.3d 818, 828 (7th Cir. 2013). Given the overwhelming evidence presented against him at trial, Breedlove cannot show a reasonable probability that but for counsel's deficient performance, the result of the proceedings would have been different. Because the state court applied the correct legal standard and its factual determinations were reasonable, Breedlove's second ineffective assistance of counsel claim must be denied.

*(3) Breedlove's Third Claim*

Lastly, Breedlove asserts that counsel was ineffective because Hamra had a conflict of interest arising out of his own criminal investigation and subsequent disbarment proceedings. Doc. 1, at 6. In order for a state prisoner to preserve a claim for federal habeas review, the petitioner must 'fairly present' the claim "throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings." *Clemons v. Pfister*, 845 F.3d 816, 819 (7th Cir. 2017) (quoting *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)). "To exhaust state remedies in the Illinois courts, the prisoner must include his claims in a petition for leave to appeal to the Illinois Supreme Court." *Snow v. Pfister*, 880 F.3d 857, 864

(7th Cir. 2018), *cert. denied sub nom. Snow v. Nicholson*, No. 17-1524, 2018 WL 2136787 (U.S. June 11, 2018).

Here, Respondent alleges, and Breedlove concedes, that he procedurally defaulted his third claim by not raising it in the postconviction appellate court or in his PLA. *See* Doc. 8, at 13; Doc. 12, at 9. Nonetheless, Breedlove argues that his procedural default should be excused because of his purported actual innocence. Specifically, Breedlove argues that

> Petitioner's testimony at the evidentiary hearing made a substantial claim of actual innocence. Petitioner testified that four black men murdered the victim and attempted to murder petitioner. Said testimony cannot be directly contradicted by anyone because Petitioner was the only witness to what occurred in [Rakestraw's] house. It would have been up to the jury whether or not they believed the Petitioner's testimony in light of all the evidence presented at trial had Petitioner been allowed to testify. Evidence that someone else committed the murder is evidence of Petitioner's actual innocence. Said testimony is sufficient to excuse the procedural default of ground III.

Doc. 12, at 9–10.

"Procedural default may be excused ... where the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Snow*, 880 F.3d at 864 (quoting *Thomas*, 822 F.3d at 386). Here, Breedlove relies on the fundamental miscarriage of justice exception—i.e., a claim of actual innocence—to excuse his procedural default. *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005). However, Breedlove's claim of actual innocence falls far short of the showing necessary to excuse such default. "To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes*, 403 F.3d at 938. Yet Breedlove's statement that his testimony at the evidentiary hearing "cannot be directly contradicted by

16

anyone because Petitioner was the only witness to what occurred in [Rakestraw's] house" is also a tacit admission that his testimony is the only evidence he has to support his claim of innocence.[2] At best, Breedlove has shown that his case might have been closer had he testified to his alternative version of events.[3] That showing is still far short of establishing that no reasonable jury would have convicted him. *See, e.g., Hayes*, 403 F.3d at 938 ("Proof of innocence must be considerably more than the proof required to establish prejudice."). Because Breedlove procedurally defaulted his third claim and failed to show that his default should be excused, Breedlove's third claim of ineffective assistance must also be denied.

## CERTIFICATE OF APPEALABILITY

Where a federal court enters a final order adverse to the petitioner, "the district court must issue or deny a certificate of appealability." 28 U.S.C. § 2254, Rule 11(a) of the Rules Governing Section 2254 Petitions. To obtain a certificate, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court denies a petition on procedural grounds, in order to obtain a certificate, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*. at 478.

---

[2] The Court is intrigued by Breedlove's assertion that he "was the only witness to what occurred in [Rakestraw's] house," as it directly conflicts with his narrative describing the "four black men" present in Rakestraw's residence at the time of her murder. Doc. 12, at 9.

[3] It is more likely that Breedlove's testimony would have been so incredible that no reasonable jury *could not* have convicted him.

The Court declines to issue a certificate of appealability here because it is not debatable that Petitioner Breedlove failed to make a substantial showing of the denial of a constitutional right with respect to claims one and two, and it is not debatable that Breedlove failed to preserve his third claim in state court and therefore forfeited his right to adjudicate that claim in a federal habeas court.

## CONCLUSION

For the reasons set forth above, Petitioner Breedlove's Petition (Doc. 1) for Writ of habeas corpus under 28 U.S.C. § 2254 is DENIED and the Court declines to issue a Certificate of Appealability.

This matter is now terminated.

Signed on this 14th day of June, 2018.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge